UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VIJAY SHAH,                          )
      Plaintiff,                     )
                                     )
v.                                   )      CIVIL ACTION
                                     )      NO. 07-cv-10352-DPW
DARRIN CZELLECZ,                     )
      Defendant.                     )
                                     )

MEMORANDUM AND ORDER
December 21, 2010

What is left of this civil rights action challenging

plaintiff Vijay Shah's detention — on reasonable suspicion but

less than probable cause — during the 2004 Democratic National

Convention ("DNC") is the question whether the sole remaining

defendant, Secret Service Special Agent Darrin Czellecz, who

transported the plaintiff to a police station to pursue

identification efforts, is entitled to qualified immunity.  I

find that he is and accordingly will allow Czellecz's motion for

judgment as a matter of law, after trial,[1] and direct the Clerk

to enter final judgment against the plaintiff.

**I. BACKGROUND**

Shah was subjected to an investigatory stop on July 25,

2004, by United States Secret Service agents during the DNC after

_____

[1] The travel of this case pre-trial is set forth in my
August 20, 2009 Memorandum and Order.  *Shah v. Holloway*, No. 07-
10352-DPW, 2009 WL 2754406 (D. Mass. Aug. 20, 2009) ("August 20,
2009 Memorandum and Order").

the agents observed him carrying a backpack and acting
suspiciously near the convention site.  Czellecz arrived on the
scene after Secret Service Special Agent J.W. Holloway had
handcuffed Shah and brought him to Boston's City Hall Plaza.

Czellecz was informed about the other agents' observations
of Shah and the need to identify him.  To that end, Czellecz
asked Shah several times to identify himself, but Shah refused to
comply.  Czellecz called the Intelligence Division Coordinating
Center ("IDCC") and received instructions from IDCC supervisors
and the legal department to obtain Shah's fingerprints to
ascertain his identity.

In the interim, a crowd of several dozen or more people
began to gather and voice demands for Shah's release.  A senior
Boston police official, concerned that the unfolding situation
was becoming unsafe, informed Czellecz that a police station was
located one block away.  Not knowing anywhere else to take Shah
for fingerprinting, Czellecz, who was on assignment from
out-of-state and not familiar with Boston, decided to transport
Shah to that station for purposes of identification.  At the
police station, Shah provided his name, name checks were
completed, and the IDCC authorized Czellecz to release Shah.
Shah's detention at the police station lasted approximately
fifteen minutes.

Several years later, Shah filed this action against a multiplicity of Boston Police and United States Secret Service defendants for damages allegedly suffered from his detention. Following motion practice, only Fourth Amendment claims against Holloway and Czellecz proceeded to trial.[2]  After a five-day trial on those claims, a jury returned a verdict for Shah only with respect to Czellecz, finding Shah had proved by a fair preponderance of the evidence that taking him to the police station constituted a *de facto* arrest without probable cause in violation of the Fourth Amendment.  The jury, however, did not award Shah any damages; I nevertheless directed entry of judgment for Shah in the amount of $1.00 as nominal damages.

Czellecz has filed a renewed motion (Doc. No. 167) for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  Having benefitted from the development of evidence at trial, I find the qualified immunity defense meritorious.

---

[2] As I noted in my August 20, 2009, Memorandum and Order on summary judgment, "[a]s a result of my grant of the City of Boston's motion to dismiss on June 22, 2007, and the motions to dismiss of the named Boston Officers through my Memorandum and Order of July 28, 2008, *Shah v. Holloway*, No. 07-10352, 2008 WL 3824788 (D. Mass. July 28, 2008), I . . . pruned Shah's contentions to permit only his Fourth Amendment claims to proceed and then only against certain of the Federal Agents." *Shah*, 2009 WL 2754406, at *1.  I directed that the case "be tried . . . against Holloway as to the stop and the handcuffing of Shah and against Czellecz as to the transport of Shah to the police station." *Id.* at *12.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 50(b) permits a party to file a renewed motion for judgement as a matter of law following a verdict. Fed. R. Civ. Pro. 50(b). This procedure is not uncommon in the qualified immunity context because, "[a]lthough . . . the immunity question should be resolved, where possible, in advance of trial, pretrial resolution sometimes will be impossible because of a dispute as to material facts." *Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir. 2002) (quotation marks and citation omitted). In such cases, "[o]nly after the facts have been settled can the court determine whether the actions were objectively reasonable so as to fall under the qualified immunity umbrella." *Id.* In my August 20, 2009 Memorandum and Order on summary judgment, I recognized after reconsideration that Czellecz's transport of Shah with less than probable cause presented just such a situation; consequently I did not resolve the qualified immunity question at that time. *See Shah v. Holloway*, No. 07-103520-DPW, 2009 WL 2754406, at *10-11 (D. Mass. Aug. 20, 2009). The time, however, is now ripe to reexamine and rule upon Czellecz's qualified immunity argument in light of the factual development at trial.

When considering a Rule 50(b) motion for judgment as a matter of law, the court's review of the record "is weighted toward preservation of the jury verdict because a verdict should

be set aside only if the jury failed to reach the *only* result

permitted by the evidence." *Quiles-Quiles v. Henderson*, 439 F.3d

1, 4 (1st Cir. 2006) (citation and internal quotation marks

omitted) (emphasis in original).  However, "[i]n the end, '[t]he

availability of qualified immunity after a trial is a legal

question informed by the jury's findings of fact, but ultimately

committed to the court's judgment.'" *Raiche v. Pietroski*, 623

F.3d 30, 35 (1st Cir. 2010) (quoting *Acevedo-Garcia v. Monroig*,

351 F.2d 547, 563 (1st Cir. 2003)) (second alteration in

original).

### III. DISCUSSION

Qualified immunity "provides defendant public officials with

an immunity from suit and not a mere defense to liability."

*Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (citing

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  In doing so, the

doctrine, in the blunt language of the Supreme Court,  "generally

protects 'all but the plainly incompetent or those who knowingly

violate the law.'" *Walden v. City of Providence*, 596 F.3d 38, 52

(1st Cir. 2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 341

(1986)).

Under the doctrine, "[o]fficials are entitled to qualified

immunity unless (1) the facts that a plaintiff has alleged or

shown make out a violation of a constitutional right and (2) the

right at issue was 'clearly established' at the time of [their]

alleged misconduct." *Id.* (quoting *Pearson v. Callahan*, — U.S. —,
129 S. Ct. 808, 816 (2009)) (internal quotation marks omitted)
(alteration in original). The Supreme Court has held that the
two prongs of this analysis need not be addressed in any
particular order. *Pearson*, 129 S. Ct. at 818. Rather, courts
"should be permitted to exercise their sound discretion in
deciding which of the two prongs of the qualified immunity
analysis should be addressed first in light of the circumstances
in the particular case at hand." *Id.* Because the case law on
whether transport of a person subject to detention on
particularized suspicion but less than probable cause to another
location for fingerprinting constitutes a Fourth Amendment
violation is not expressly settled, I find it appropriate to
proceed by addressing the "clearly established" prong of the
analysis.

The "clearly established" prong of the analysis itself has
two aspects. *Id*. The first aspect "focuses on the clarity of
the law at the time of the alleged civil rights violation" and
whether the "'contours of the right . . . [were] sufficiently
clear that a reasonable official would understand that what he is
doing violates that right.'" *Maldonado*, 568 F.3d at 269 (quoting
*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The second
aspect examines "the facts of the particular case and whether a
reasonable defendant would have understood that his conduct

violated the plaintiffs' constitutional rights." *Id.* Overall, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.*

Czellecz argues that he is entitled to qualified immunity because it was not clearly established as a matter of law that, in exigent circumstances, a person detained on less than probable cause may not be transported to a police station for fingerprinting and identification procedures. In this connection, Czellecz has conceded that he acted on the basis of reasonable suspicion but without probable cause.

## A.   The Clarity of the Law

I begin by asking "whether the right in question was so clearly established as to give notice to [Czellecz] that [his] actions were unconstitutional" in 2004, when he brought Shah from City Hall Plaza to the police station one block away for fingerprinting. *See Walden*, 596 F.3d at 53. This inquiry is "a question of pure law" that "must be resolved based on the state of the law at the time of the alleged violation." *Id.* A law is not clearly established if "[t]here were no Supreme Court cases, no cases of controlling authority in [this] jurisdiction at the time of the incident, and no consensus of cases of persuasive authority showing that [Shah's] asserted Fourth Amendment rights were clearly established" at that time. *Id.* (quoting *Wilson v.*

*Layne*, 526 U.S. 603, 617 (1999)) (internal quotation marks omitted). In developing the law of investigatory stops, begun with *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has concluded that "an investigative detention must . . . last no longer than is necessary to effectuate the purpose of the stop" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Klaucke v. Daly*, 595 F.3d 20, 24 (1st Cir. 2010) ("In determining whether a *Terry* stop is justified, our inquiry involves two steps, first, whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place." (quotation marks and citation omitted)). Because the jury found in favor of Holloway, who made the initial investigatory stop of Shah, I need only address the second, scope-oriented element of this inquiry. In doing so, I must examine the totality of the circumstances in order to determine where Czellecz's continued detention of Shah falls "along the continuum of detentions," *i.e.*, whether it constituted an ongoing *Terry* stop, or escalated to a *de facto* arrest violating the Fourth Amendment in the absence of probable cause. *See United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998).

A review of the case law governing the permissible scope of *Terry* stops reveals that "[t]here is no fixed guide to what police investigative measures are within the scope of a *Terry* stop; in all events, the touchstone is the reasonableness of the measures undertaken to quell or confirm the officer's suspicions." *Klaucke*, 595 F.3d at 25; *see also United States v. Acosta-Colon*, 157 F.3d 9, 21 (1st Cir. 1998) (noting that the First Circuit has repeatedly "emphasize[d] . . . that there are no bright-line rules to determine whether an investigatory stop initiated on the basis of reasonable suspicion falls within the ambit of *Terry*"). "Thus, even though several aspects of [a] stop and detention . . . appear to mirror characteristics of a traditional arrest, these features do not automatically convert the episode into a *de facto* arrest." *Id.* Neither of the parties here, however, dispute that relocation of the subject of a *Terry* stop to a police station is one of the traditional indicia of arrest. The question is whether that indicium clearly establishes a Fourth Amendment violation.

The Supreme Court has consistently held that "the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Hayes v. Florida*, 470 U.S. 811, 816 (1985); *see also Dunaway v.*

*New York*, 442 U.S. 200, 216–17 (1979); *Davis v. Mississippi*, 394 U.S. 721, 728 (1969).  More specifically, the Court in *Hayes* affirmed its holding in *Davis* that, "in the absence of probable cause or a warrant, investigative detentions at the police station for fingerprinting purposes could not be squared with the Fourth Amendment."  *Hayes*, 470 U.S. at 815 (citation omitted).

The Supreme Court reaffirmed this position most recently in 2003 but, as it had in each preceding case addressing the issue, reserved the possibility that removal of a suspect without probable cause might be appropriate in limited circumstances. *Kaupp v. Texas*, 538 U.S. 626, 630 n.2 (2003) (*per curiam*) ("We have, however, left open the possibility that, 'under circumscribed procedures,' a court might validly authorize a seizure on less than probable cause when the object is fingerprinting." (quoting *Hayes*, 470 U.S. at 817)).  Even in *Davis*, the first case in which the Supreme Court considered the scope of investigative stops involving transportation of suspects, the Court "indicated that perhaps under narrowly confined circumstances, a detention for fingerprinting on less than probable cause might comply with the Fourth Amendment, but found it unnecessary to decide that question since no effort was made to employ the procedures necessary to satisfy the Fourth Amendment."  *Hayes*, 470 U.S. at 814 (discussing *Davis*).  In *Dunaway*, the Court "repeat[ed] the possibility that the Amendment

-10-

might permit a narrowly circumscribed procedure for
fingerprinting detentions on less than probable cause." *Id.* at
815 (discussing *Dunaway*). In particular, the *Hayes* Court left
open the possibility that "exigent circumstances [may] mak[e]
necessary the removal of [a subject of a *Terry* stop] to the
station house for the purpose of fingerprinting." *Id.* at 817
n.3.

Two themes emerge from the Supreme Court's case law on this
issue.

*First*, there is something inherently different — and less
intrusive for purposes of the Fourth Amendment — about detention
for fingerprinting or identification only and detention for
fingerprinting *and* interrogation. *See, e.g.*, *Dunaway*, 442 U.S.
("[A]s the [*Davis*] Court emphasized, 'petitioner was not merely
fingerprinted during the . . . detention but *also subjected to
interrogation*. . . . [D]etention for custodial interrogation —
regardless of its label — intrudes so severely on interests
protected by the Fourth Amendment as necessarily to trigger the
traditional safeguards against illegal arrest." (quoting *Davis*,
394 U.S. at 728) (emphasis and first ellipsis in original));
*Davis*, 394 U.S. at 727 ("It is arguable, however, that, because
of the unique nature of the fingerprinting process, such
detentions might, under narrowly defined circumstances, be found

to comply with the Fourth Amendment even though there is no
probable cause in the traditional sense.").

Safety and security has been an integral element of this
purported exception: "[T]here are undoubtedly reasons of safety
and security that would justify moving a suspect from one
location to another during an investigatory detention, such as
from an airport concourse to a more private area."  *Royer*, 460
U.S. at 504–05; *see also United States v. Moroney*, 220 F. Supp.
2d 52, 57 (D. Mass. 2002) ("The line distinguishing an arrest
from a *Terry* stop is sometimes fuzzy: the facts of each case
determine on which side of the line a case will fall, and
increasingly, the law appears to favor public safety over other
concerns.").

*Second*, the Court has explicitly contemplated the
permissibility of relocation of a suspect without probable cause
in certain circumstances — most notably, "exigent circumstances"
— for fingerprinting and identification.  *See, e.g.*, *Hayes*, 470
U.S. at 816–17 & n.3.  This is in part because the Supreme Court
has also consistently recognized that identification of a suspect
is "a routine and accepted part of many *Terry* stops."  *Hiibel v.*
*Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 186 (2004)
(citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)).
After all, "[t]he request for identity has an immediate relation

to the purpose, rationale, and practical demands of a *Terry*

stop."  *Id.* at 188.

Within the framework of this jurisprudence, the First

Circuit has established some — albeit broadly worded — guidelines

for when an officer's relocation of a *Terry*-stop subject does not

fall afoul of the Fourth Amendment.  *See Acosta-Colon*, 157 F.3d

at 15; *see also United States v. Le*, 377 F. Supp. 2d 245, 255 (D.

Me. 2005) ("The First Circuit has suggested that relocation of a

defendant may be permissible for 'security reasons.'" (quoting

*Acosta-Colon*, 157 F.3d at 17)).  In *Acosta-Colon*, the First

Circuit found that transporting the suspect to a holding room

constituted a *de facto* arrest in that case because "the

government . . . utterly failed to identify *specific facts*

supporting its invocation of 'security reasons' as justification

for the movement of Acosta to the interrogation room."  157 F.3d

at 17 (emphasis in original).  By requiring "specific facts," the

court seeks something more than the general, uniform proposition

that it is safer to question a suspect in a controlled

environment.  *Id.* at 18.  Rather, "[t]he government must point to

*some* specific fact or circumstance that could have permitted law

enforcement officers reasonably to believe that relocating the

suspect to a detention room was necessary to effectuate a safe

investigation."  *Id.* at 17 (emphasis in original).  Thus,

although the Supreme Court has never had occasion to find the

relocation of the subject of a *Terry* stop to be compliant with
the Fourth Amendment, the First Circuit has interpreted the
Supreme Court's case law to permit relocation in very
circumscribed circumstances.

It is not, therefore, clearly established, as Shah argues,
that *any* transportation or relocation of an individual stopped
under reasonable suspicion is categorically tantamount to a
Fourth Amendment violation.  The Supreme Court's reservations and
the First Circuit's explicit holding that transport without
probable cause can be permissible if the government can
articulate specific facts demonstrating necessity, underscore
that it was not clearly established that Czellecz's removal of
Shah constituted a constitutional violation in July 2004.  A
reasonable officer would not have understood the case law to
preclude any removal whatsoever.  Indeed, courts in this circuit,
following *Acosta-Colon*, have recognized that transportation of
individuals stopped by police on reasonable suspicion to another
location, without probable cause, can be within the scope of a
*Terry* stop.  *See United States v. Meadows*, 571 F.3d 131, 143 (1st
Cir. 2009) (finding that the government had produced sufficient
"specific facts" related to security that rendered reasonable the
removal of a suspect, hand-cuffed, from the house within the
scope of an investigatory stop); *Le*, 377 F. Supp. 2d at 255
(finding that, "the Government ha[d] not demonstrated the

-14-

extraordinary circumstances in this case that would allow police

to transfer the suspect to a police station without arresting

her"); *United States v. Robinson*, No. CRIM.04-59-P-H, 2004 WL

2030275, at *6 (D. Me. Sept. 13, 2004) (finding transportation

permissible without probable cause under *Acosta-Colon* when "the

four people in the Pontiac were moved to the nearby DEA office,

out of the rain and away from curious onlookers, for questioning

under more controlled circumstances").

This is not to relieve a government agent of his burden to

adduce specific facts supporting relocation during a *Terry* stop.

As the First Circuit recognized in *Acosta-Colon*, there is

something of a slippery slope inherent in the "invocation of

security reasons as justifications for the movement" of detained

individuals to interrogation rooms or holding cells.  157 F.3d at

17.  Because moving suspects to such places "will *always*

incrementally enhance the safety and security of law enforcement

officers and the public . . . there will *always* exist 'security

reasons' to move the subject of a *Terry*-type stop to a confined

area pending investigation."  *Id.* (emphases in original).  Thus,

the First Circuit requires the government to provide a

justification that "cannot rest upon bald assertions" by

"point[ing] to *some* specific fact or circumstance that could have

permitted law enforcement officers reasonably to believe that

relocating the

suspect" during an investigatory detention "was necessary to effectuate a safe investigation." *Id.* (emphasis in original).

Given the state of this case law, I find and conclude that Shah's right to be free from transport without probable cause was not clearly established at the time Czellecz undertook to do so because, "[i]n addition to there being no clear notice from the Supreme Court opinions, [I] have found no cases in this circuit or elsewhere sufficiently similar to have alerted [Czellecz] to the illegality of [his] conduct." *Walden*, 596 F.3d at 53. Rather, case law from this circuit can be read to hold that such action is permissible when, as here, the government articulates specific security factors necessitating transport to a station solely for the purpose of fingerprinting and identification.

## B. A Reasonable Officer's Understanding in the Circumstances

Turning to the second aspect of the clearly established prong of qualified immunity analysis, given the facts of this particular case, I cannot say that "a reasonable defendant would have understood that his conduct violated [Shah's] constitutional rights." *Maldonado*, 568 F.3d at 269. I conclude upon the totality of the circumstances that a reasonable law enforcement officer could consider Shah's detention to involve exigent circumstances, an exception to the near-categorical ban on transportation to a police station on less than probable cause. *See Hayes*, 470 U.S. at 817 n.3. As required by the First

Circuit, Czellecz points to specific facts upon which he

reasonably believed that relocating Shah to a police station was

necessary.  *See Acosta-Colon*, 157 F.3d at 17.  These include the

DNC's status as the first national political convention after the

September 11, 2001, terrorist attacks and its designation as a

National Special Security Event;[3] Shah's suspicious behavior

leading up to his detention; his continuous refusal to cooperate

and to provide identification; a vocal and potentially boisterous

crowd where he was being detained, which was calling for his

release;[4] the instruction from Czellecz's IDCC supervisors and

legal advisors to transport Shah somewhere for fingerprinting and

identification; and the suggestion from an experienced local

police officer that a nearby police station would provide a

secure setting for fingerprinting.  This factual matrix provides

---

[3] The extensive security arrangements at the DNC were
considered in *Coal. to Protest Democratic Nat'l Convention v.
City of Boston*, 327 F. Supp. 2d 61 (D. Mass.), *aff'd sub nom.
Bl[a]ck Tea Soc'y v. City of Boston*, 378 F.3d 8 (1st Cir. 2004).
As the First Circuit recently observed, when addressing the
circumstances of a *Terry* stop during another security sensitive
time period, "[i]n response to the real prospects of terrorist
attacks . . . it was appropriate for police [conducting a *Terry*
stop detention] to take into account the location of the
suspicious conduct and the degree of potential danger being
investigated."  *United States v. Ramos*,
— F.3d —, 2010 WL 5129826, at *6 (1st Cir. Dec. 17, 2010).

[4] While my own review of video tape of the crowd gathered at
the place of detention did not persuade me that the group was
particularly threatening, I recognize that one of "two
established stands of Fourth Amendment law . . . is that weight
must be given to police officers' training and experience."  2010
WL 5129826, at *6.

specific justification for Czellecz's decision to follow the directives of his superiors and transport Shah to a police station only one block away for fingerprinting.

The situation faced by Czellecz is, in fact, more exigent than other instances in which courts have upheld officers' justifications for transporting an individual to a police station on less than probable cause. *See, e.g.*, *United States v. Swanson*, 155 F. Supp. 2d 992, 999 (C.D. Ill. 2001) (holding that the "decision to take the Defendant to the police station, rather than keep him at the scene of the stop" was "not critical for the first hour" of his detention because if the Defendant "could have been detained at the scene of the traffic stop" for that hour, then it was "immaterial" that he had been transported to the police station during that period); *United States v. Woods*, 837 F. Supp. 525, 530 (W.D.N.Y. 1993) (finding that "the officers' investigative stop of Defendant and his bags was a permissible *Terry*-type detention founded on reasonable suspicion that Defendant was engaged in drug trafficking activity, and that this detention did not ripen into a full-blown arrest when Defendant accompanied the officers to the [bus terminal police office]"). Like the defendant in *Woods*, Shah refused to comply with the agents' requests for identification, which was reasonably related to the purpose of the initial investigatory stop, and thus aroused further suspicion. *See also Klaucke*, 595 F.3d at 26

("Klaucke's refusal to produce a license that would have alleviated the officer's stated concerns reasonably roused a suspicion that his non-cooperation was driven by other considerations, like an outstanding warrant for his arrest or other criminal history."). Moreover, while the individuals detained and transported in *Swanson*, *Robinson*, and *Meadows* were removed from the scene of the stop for interrogation, Shah was transported solely for the purpose of identification. *Cf. Meadows*, 571 F.3d at 143; *Robinson*, 2004 WL 2030275, at *6; *Woods*, 837 F. Supp. at 530. Moreover, Shah was at the police station for only fifteen minutes and released as soon as he finally identified himself.

## C. Conclusion

Given the lack of clarity in the case law and the exigent circumstances articulated by Czellecz, I find that Shah's right to be free from transportation to the station in this particular instance was not clearly established. The unsettled state of the law at the time could not "g[i]ve the defendant fair warning that his particular conduct was unconstitutional." *Maldonado*, 568 F.3d at 269. Because the "clearly established" prong of the qualified immunity analysis is sufficient, I need not determine whether Czellecz's actions actually constituted a violation of Shah's Fourth Amendment rights. *See Pearson*, 129 S. Ct. at 818. Accordingly, I find that Czellecz is entitled to qualified immunity as a matter of law and grant his Rule 50(b) motion.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Defendant's renewed motion (Doc. No. 167) for judgment as a matter of law.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE